UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY ANTWAN JONES,

       Petitioner,

                                  CASE NO. 05-CV-40319-FL
v.                                  JUDGE PAUL V. GADOLA
                                  MAGISTRATE JUDGE PAUL J. KOMIVES

SHIRLEE A. HARRY,[1]

       Respondent.
_____/

**REPORT AND RECOMMENDATION**

*Table of Contents*

I.   RECOMMENDATION .................................................................... 2
II.  REPORT .................................................................................... 2
     A.   *Procedural History* ............................................................. 2
     B.   *Factual Background Underlying Petitioner's Conviction* ................ 3
     C.   *Standard of Review* ............................................................ 7
     D.   *Evidentiary Claims (Claims I and II)* ...................................... 9
          1.   *Clearly Established Law* ............................................... 9
          2.   *Analysis* ................................................................. 10
               a. Convicted Felon Evidence ........................................ 11
               b. Rebuttal Evidence .................................................. 12
     E.   *Exculpatory Evidence Claim (Claim III)* .................................. 13
          1.   *Clearly Established Law* ............................................... 13
          2.   *Analysis* ................................................................. 13
     F.   *Confrontation Claim (Claim IV)* ........................................... 15
     G.   *Conclusion* ..................................................................... 15
III. NOTICE TO PARTIES REGARDING OBJECTIONS ................................ 16

---

[1]By Order entered this date, Shirlee A. Harry has been substituted for Cindi Curtin as the proper respondent in this action.

I.      RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.

II.     REPORT:

A.      *Procedural History*

1.      Petitioner Anthony Antwan Jones is a state prisoner, currently confined at the Muskegon Correctional Facility in Muskegon, Michigan.

2.      On September 13, 2002, petitioner was convicted of armed robbery, MICH. COMP. LAWS § 750.529; first-degree home invasion, MICH. COMP. LAWS § 750.110a(2); possession of a firearm by a convicted felon, MICH. COMP. LAWS § 750.224f; felonious assault, MICH. COMP. LAWS § 750.82; and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Genesee County Circuit Court.  On December 20, 2002, he was sentenced as an habitual offender, third offense, MICH. COMP. LAWS § 769.11, to concurrent terms of 264-450 months' imprisonment on the armed robbery conviction, 264-480 months' imprisonment on the home invasion conviction, 60-120 months' imprisonment on the felon in possession conviction, and 60-90 months' imprisonment on the felonious assault conviction.  He was also sentenced to a mandatory consecutive term of two years' imprisonment on the felony-firearm conviction.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

>   I.   THE TRIAL COURT ABUSED ITS DISCRETION BY INFORMING THE JURY THAT DEFENDANT-APPELLANT WAS A CONVICTED FELON OVER STIPULATION BY THE PARTIES.
>
>   II.  IT WAS AN ABUSE OF DISCRETION TO ALLOW THE ASSISTANT PROSECUTOR TO RE-INTRODUCE TESTIMONY IN HIS CASE IN

2

    CHIEF AS REBUTTAL EVIDENCE.

Petitioner raised two additional claims in a *pro se* supplemental brief:

  III. THE WITHHOLDING OF EXCULPATORY EVIDENCE BY THE PROSECUTION IS IN DIRECT VIOLATION OF THE DEFENDANT'S FIFTH AND FOURTEENTH AMENDMENT RIGHTS OF DUE PROCESS OF RECEIVING A FAIR TRIAL.

  IV. THE CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT WAS VIOLATED WHEN A POLICE OFFICER WHO HAD NO PERSONAL KNOWLEDGE OF THE FINGERPRINT, OR SWAB TEST, WAS PERMITTED TO TELL THE JURY ABOUT IT'S [sic] RESULTS.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Jones*, No. 245890, 2004 WL 787164 (Mich. Ct. App. Apr. 13, 2004) (per curiam).

  4. Petitioner, proceeding *pro se*, sought leave to appeal these four issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Jones*, 472 Mich. 865, 692 N.W.2d 842 (2005).

  5. Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on October 19, 2005. As grounds for the writ of habeas corpus, he raises the four claims that he raised in the state courts.

  6. Respondent filed his answer on April 27, 2006. He contends that petitioner's claims are procedurally defaulted or without merit.

  7. Petitioner filed a reply to respondent's answer on June 1, 2006..

B. *Factual Background Underlying Petitioner's Conviction*

  The trial testimony leading to petitioner's convictions was accurately summarized in petitioner's brief in the Michigan Court of Appeals:

  David Roda testified that on January 23, 2002, he was at a motel room at the Genesee Motor Inn in Flint. He was watching television. (T.T. Vol. I p. 139) He

saw some people walk by his window, they were wearing heavy coats with hoods on. (T.T. Vol. I p. 140) Then he heard a loud banging. He saw the men at room Number 12 trying to kick the door in. He telephoned the police, to tell them "there was a problem in the room across the way." (T.T. Vol. I p. 143-144). As he was talking to the motel office to report this incident, he heard a pop and did not know whether it was a gunshot, firecracker or backfire from a car. (T.T. Vol. I p. 144-145) After he heard the shot, the door to room 12 was closed and he couldn't see any activity in front of the room. (T.T. Vol. I p. 145) Before the shot, he had seen the three men enter the room. About five minutes after they entered the room, the police arrived. (T.T. Vol. I p. 147) He saw the police remove eight to ten people from the room (T.T. Vol. I p. 149).

Amanda Eads testified that on January 23, 2002, she was living at the Genesee Motor Inn in room number 12 with a man named Anquan Carter. (T.T. Vol. I p. 154-156) She had left the room with a friend Ellemai Morgan to get Ellemai's clothes. (T.T. Vol. I p. 167) They returned twenty minutes later and parked their vehicle in front of the motel room. (T.T. Vol. I p. 170) As they approached the room a man with a large chrome gun walked up to them and said "come with my Baby Girl." (T.T. Vol. I p. 173) He walked them into the room. (T.T. Vol. I p. 175) When she entered the room, Ms. Eads saw two other individuals in the room. (T.T. Vol. I p. 177) The room was "completely torn apart." (T.T. Vol. I p. 179) The man with the gun ordered the women to "lay on the bed." (T.T. Vol. I p. 180) All three of the individuals had guns. (T.T. Vol. I p. 181) She saw two of the men beating on the bathroom door and she could hear people inside yelling. (T.T. Vol. I p. 187) She could hear Anquan Carter's voice coming from the bathroom. He was in there with people Ms. Eads knew as Dirty and Carrie. (T.T. Vol. I p. 190) The men told Ms. Eads they wanted the keys to the Cadillac she drove up in. (T.T. Vol. I p. 191) She did not hear a gunshot in the room. (T.T. Vol. I p. 192) The two men were able to enter the bathroom. (T.T. Vol. I p. 193). She saw Anquan Carter hand the men money and car keys to the men with the guns. (T.T. Vol. I p. 194) They made him strip from the waist down at gunpoint. (T.T. Vol. I p. 194) One of the gunmen announced "the hood" and the men dropped; taking off their masks and dropping their guns. The police were outside saying open up. Dirty left the bathroom and opened the door. (T.T. Vol. I p. 196-197) The police grabbed him and tossed him aside. (T.T. Vol. I p. 204) They pulled him outside very roughly. (T.T. Vol. I p. 205) Then the police entered and escorted each individual outside. (T.T. Vol. I p. 206-207)

Officer Brian Murphree testified that he received a radio call on January 23, 2002, in reference to a man with a gun and shots fired. (T.T. Vol. I p. 223-224) He was dispatched to the Genesee Motor Inn. (T.T. Vol. I p. 224) Officer Murphree and his partner pounded on the door of room 12 with their guns drawn. (T.T. Vol. I p. 225-226) They announced police and the door opened, but was stopped by a chain lock. (T.T. Vol. I p. 227) One person said, "I'm coming to the door" and that person exited the room. (T.T. Vol. I p. 228) That person advised the officer that there were three subjects in the room with handguns. (T.T. Vol. I p. 229) Officer Murphree and

4

Officer Miller ordered everyone to lay down. (T.T. Vol. I p. 230) When additional police officers arrived at the scene the police checked everyone in the position they laid down in. (T.T. Vol. I p. 233) Defendant-Appellant was nearest to the front door. (T.T. Vol. I p. 234) He was laying face down on the floor in a prone position. (T.T. Vol. I p. 235) They secured him in the room and then they escorted him outside. (T.T. Vol. I p. 236) He had a gun underneath his right forearm. (T.T. Vol. I p. 237) There also was a blue and white bandana opposite where Defendant-Appellant was laying. (T.T. Vol. I p. 238) He found another gun. There was also present an individual named DeQuan Norwood. (T.T. Vol. I p. 239) Then there was another co-defendant located, a Mr. Grayden, and a gun was also found in his vicinity. (T.T. Vol. I p. 240) Each officer went to an individual that was laying prone, searched that person, secured him or her with handcuffs, and escorted each person from the motel room. (T.T. Vol. I p. 241)

Anquan Carter testified that on January 23, 2002, he lived at the Genesee Motor Inn in room 12. (T.T. Vol. II p. 284-286) He checked into the room under Amanda Eads' name because he was too young to rent a room. (T.T. Vol. II p. 289) He and Amanda were living in the room on that date. (T.T. Vol. II p. 296) He and Dirty were getting ready to leave the apartment when he saw three guys running across the parking lot. (T.T. Vol. II p. 297) The men all had masks on their faces and they were running towards his room. (T.T. Vol. II p. 298) Mr. Carter was scared and he slammed the door. (T.T. Vol. II p. 299) He was in the room with Amanda, Ellen, Carrie, and Dirty. (T.T. Vol. II p. 302) He went into the bathroom and closed the door. (T.T. Vol. II p. 304) Also in the bathroom was Dirty and Carrie. He heard the men outside trying to get in. (T.T. Vol. II p. 305-306) He heard the men enter the room. (T.T. Vol. II p. 306) The men tore the room apart looking for money and drugs (T.T. Vol. II p. 309) He could hear someone ask "where the money was." (T.T. Vol. II p. 310) Two or three minutes after they broke into the room, the men began kicking the bathroom door. (T.T. Vol. II p. 312) After kicking the door he heard a gunshot. (T.T. Vol. II p. 312-313) He saw a hole through the top of the door, Dirty called the police. (T.T. Vol. II p. 317) After the shot, Mr. Carter moved his foot away from the door and they pushed the door open. He saw two people there. (T.T. Vol. II p. 319) The people had bandanas over their faces. (T.T. Vol. II p. 320) They both had guns. (T.T. Vol. II p. 320) They told Mr. Carter that they wanted his money and drugs. (T.T. Vol. II p. 321) He gave them money. (T.T. Vol. II p. 322) He was not able to see a third guy. He also gave them Dirty's car keys. (T.T. Vol. II p. 324) Someone pulled his pants down. (T.T. Vol. II p. 326) Then he heard a knock on the door. He heard someone say, "Flint Police, open up." (T.T. Vol. II p. 327) Dirty left the bathroom and opened the door for the police. (T.T. Vol. II p. 329) He saw both men drop their bandanas, the money, car keys, and guns. (T.T. Vol. II p. 329-331) He identified Defendant-Appellant as the taller person who had a gun pointed at him. (T.T. Vol. II p. 331-332) He later saw a third man with a gun near the refrigerator. After Dirty left [t]he room the police pulled that man out. (T.T. Vol. II p. 327) Then they removed Mr. Carter from the room. (T.T. Vol. II p. 338) He explained to the police what had happened. (T.T. Vol. II p. 339).

DeQuan Harwood testified that he knew Defendant-Appellant for about a year. (T.T. Vol. III p. 500) He entered a guilty plea to Assault with Intent to Rob While Armed and Home Invasion, Third Degree. (T.T. Vol. III p. 501) As part of his plea agreement he was required to give truthful testimony regarding his co-defendants. (T.T. Vol. III p. 502) On January 23, 2002, he ran into Anthony Jones and Joseph Grayden. (T.T. Vol. III p. 502-503) He knew both of them from the neighborhood. (T.T. Vol. III p. 504) He rode a city bus with Mr. Jones and Mr. Grayden. (T.T. Vol. III p. 505) Defendant-Appellant had told him he was going to visit a friend known as Anquan or Cheese. (T.T. Vol. III p. 506) Then Defendant-Appellant told him that he was going to do a "lick" or robbery. (T.T. Vol. III p. 507) Everyone had guns on the bus. (T.T. Vol. III p. 508) Everyone had a bandana to cover his face. (T.T. Vol. III p. 511) Defendant-Appellant directed them to the motel. (T.T. Vol. III p. 514) They spoke about getting money and drugs from Cheese. (T.T. Vol. III p. 516-517) On the way to the Motel they were joined by another individual. (T.T. Vol. III p. 519) He was supposed to park nearby and be the getaway driver. (T.T. Vol. III p. 520) They were in the motel parking lot when they saw Cheese and another individual leave a room. (T.T. Vol. III p. 522) They put their bandanas on to mask their faces. (T.T. Vol. III p. 526) Cheese noticed them and ran back inside. (T.T. Vol. III p. 529) One of them pounded on the door. (T.T. Vol. III p. 532-533) The door was kicked in. (T.T. Vol. III p. 534) Mr. Norwood was looking out, making sure there were no witnesses. (T.T. Vol. III p. 535) Grayden and Jones went into the room. (T.T. Vol. III p. 536) While Mr. Norwood was acting as a lookout, two females pulled up in front of the apartment in a car. (T.T. Vol. III p. 538) He heard a gunshot come from the room before the women pulled up. (T.T. Vol. III p. 539) He told the women to go into the room. (T.T. Vol. III p. 540) The women went into the room. (T.T. Vol. III p. 541-542) He closed the door and pulled his gun out. (T.T. Vol. III p. 542) He told the women to sit on the bed. (T.T. Vol. III p. 544) Defendant-Appellant and Grayden were close to the bathroom door when they walked in. (T.T. Vol. III p. 546) They were trying to force their way into the bathroom. (T.T. Vol. III p. 547) He heard a knock and the police identified themselves and told them to open up the door. (T.T. Vol. III p. 551) One of the individuals from the bathroom let the police in. The police told everyone to get on the floor. (T.T. Vol. III p. 552) Mr. Norwood got down on the ground. He put the gun behind the refrigerator and took off his mask. (T.T. Vol. III p. 553-554) He took off the mask because he did not want the police to think he was a robber. (T.T. Vol. III p. 554) The police came in and picked him up and took him from the room. (T.T. Vol. III p. 555) The police put him in the same car as Cheese. (T.T. Vol. III p. 557)

Joseph Grayden testified that on January 23, 2002, he came into contact with DeQuan Norwood and Anthony Jones. He identified Defendant-Appellant as Anthony Jones. (T.T. Vol. III p. 565-566) They took a bus to the Genesee Motor Inn. Mr. Grayden was armed with a handgun. (T.T. Vol. III p. 567) The other two were also armed and they all had handkerchiefs with them. (T.T. Vol. III p. 568) When they met up they planned to rob a person named Cheese. (T.T. Vol. III p. 569) Mr. Norwood was to be the lookout while Mr. Grayden and Defendant-Appellant

>were to go into the room to rob Cheese. (T.T. Vol. III p. 571) Mr. Grayden testified that there was not a fourth person there in a car. (T.T. Vol. III p. 571-572) They put on the bandanas and walked toward room 12. (T.T. Vol. III p. 572) When they got to the door they pulled out their guns. (T.T. Vol. III p. 573) They saw Cheese in the doorway. He went back into the room. Then he and Defendant-Appellant kicked the door open. (T.T. Vol. III p. 574) When they entered the room the[y] didn't see anyone. Mr. Grayden went to the bathroom. (T.T. Vol. III p. 576) Mr. Grayden and Defendant-Appellant then kicked the bathroom door open. (T.T. Vol. III p. 577) Defendant-Appellant shot his gun at the bathroom door. When the door was open they demanded property. (T.T. Vol. III p. 578) They demanded money and drugs. (T.T. Vol. III p. 579) Cheese gave him about $150.00. (T.T. Vol. III p. 581) Then he demanded the car key[s] and picked them up from the bathroom floor. Then Mr. Norwood brought two females into the room. (T.T. Vol. III p. 582) When the police announced their presence, Mr. Grayden took off his mask because he didn't want to be caught. (T.T. Vol. III p. 582-583) When the police came Mr. Evans opened the door, ran out, and told the police three men were in the room robbing them. (T.T. Vol. III p. 584) Then he was arrested. (T.T. Vol. III p. 586) Mr. Grayden pled to both armed robbery and felony firearm. (T.T. Vol. III p. 587).

Def.-Appellant's Br. on App., in *People v. Jones*, No. 245890 (Mich. Ct. App.), at 1-7.

C.   *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

>(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>   (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>   (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its

decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.     *Evidentiary Claims (Claims I and II)*

In his first two claims, petitioner contends that he was denied a fair trial by the trial court's evidentiary rulings. The Court should conclude that petitioner is not entitled to habeas relief on these claims.[2]

1.     *Clearly Established Law*

---

[2]Respondent contends that petitioner's first evidence claim is barred by petitioner's procedural default in failing to object at trial, an argument respondent also makes with respect to petitioner's third and fourth claims. Because, as discussed below, these claims are clearly without merit, the Court may deny the petition on this basis without first addressing procedural default. *See Trest v. Cain*, 522 U.S. 87, 89 (1997) (procedural default is not jurisdictional); *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999) (internal citations omitted) ("[J]udicial economy sometimes dictates reaching the merits of [a claim or claims] if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated.").

Unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional violation. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994); *see also, Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process).

In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

    2.    *Analysis*

*a. Convicted Felon Evidence*

Petitioner first contends that he was denied a fair trial when the trial court informed the jury, prior to *voir dire*, that petitioner was a convicted felon, despite a stipulation by petitioner that he was ineligible to carry a firearm. This claim fails, for three reasons. First, the trial court did not inform the jury that petitioner, in fact, was a convicted felon. Rather, the court merely read to the jury the Information, which charged petitioner with possession of a firearm by a felon. *See* Trial Tr., Vol. I, at 16. Second, petitioner cannot show that he was denied a fair trial by the trial court's reading of the charges in the Information. Even if the reading suggested to the jury that petitioner had a prior felony conviction, that fact was an element of the charges against him. In *Old Chief v. United States*, 519 U.S. 172 (1997), the Court held that if the defendant is charged with a crime, one element of which is a previous felony conviction, the government must accept the defendant's stipulation that he had such a conviction without introducing the facts and nature of the felony itself. *See Old Chief*, 519 U.S. at 190-92. This decision does not provide a basis for relief, however, because *Old Chief* was decided as a matter of federal evidentiary law under Rule 403. It was not decided as a federal constitutional matter, and thus has no application in the habeas context. *See Bugh v. Mitchell*, 329 F.3d 496, 512-13 (6th Cir. 2003); *Jordan v. Haunani-Henry*, No. 98-15844, 1999 WL 974178, at *3 n.6 (9th Cir. Oct. 22, 1999); *cf. Johnson v. Carroll*, 250 F. Supp. 2d 395, 400 (D. Del. 2003) (petitioner did not exhaust his claim merely by citing *Old Chief*, because *Old Chief* does not establish a rule of federal constitutional law). Finally, petitioner cannot show he was prejudiced by the trial court's reference. As the court of appeals explained, the trial court's reading of the Information was in accordance with Michigan Court Rule 6.412, and any prejudice was cured by the trial court's instructions that petitioner denied the charges against him and that the

Information was not evidence. *See Jones*, 2004 WL 787164, at *2, slip op. at 2. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. Rebuttal Evidence

Petitioner also argues that he was denied a fair trial when the prosecution was permitted to recall Officer Murphree to rebut defense counsel's implication that the police were incompetent in failing to order a gunshot residue test. *See* Trial Tr., Vol. II, at 486-90. Petitioner contends that this was improper rebuttal evidence, and that its admission denied him a fair trial. The Court should disagree. First, as the court of appeals noted, Officer Murphree was recalled during the prosecutor's case-in-chief, before the prosecution had rested its case. Thus, Officer Murphree's additional testimony is not properly characterized as rebuttal testimony. Second, the trial court's ordering of the proofs in this case and the prosecution's presentation of Murphree's testimony present issues of state evidentiary law subject to the deferential standard of review set forth above. *See Henderson v. Norris*, 118 F.3d 1283, 1286 (8th Cir. 1997); *White v. Withrow*, No. 00-74231, 2001 WL 902624, at *7 (E.D. Mich. June 22, 2001) (Rosen, J.); *Pickens v. Lockhart*, 802 F. Supp. 208, 217 (E.D. Ark. 1992). Furthermore, "[a] trial court possesses particularly broad discretion to determine permissible areas of inquiry on rebuttal." *Castro v. Sullivan*, 662 F. Supp. 745, 748 (S.D.N.Y. 1987); *see also*, *United States v. Askanazi*, 14 Fed. Appx. 538, 540 (6th Cir. 2001); *White*, 2001 WL 902624, at *7. Petitioner has failed to offer anything to show that this evidence–which explained the observation by Officer Murphree that petitioner was in possession of a gun when Officer Murphree entered the motel room–was not a proper response to defense counsel's implication that the police were negligent in failing to conduct a gunshot residue test. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.     *Exculpatory Evidence Claim (Claim III)*

Petitioner next contends that his right to a fair trial was violated when the police failed to disclose exculpatory evidence. Specifically, petitioner claims that the prosecution failed to disclose the results of a gunshot residue swab test. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.     *Clearly Established Law*

The Due Process Clause requires the state to disclose exculpatory evidence to the defense. *See Brady v. Maryland*, 373 U.S. 83 (1963). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Thus, in order to establish a *Brady* claim, petitioner must show that: (1) evidence was suppressed by the prosecution in that it was not known to petitioner and not available from another source; (2) the evidence was favorable or exculpatory; and (3) the evidence was material to the question of petitioner's guilt. *See Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000); *Luton v. Grandison*, 44 F.3d 626, 628-29 (8th Cir. 1994); *see also*, *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972). Petitioner bears the burden of establishing each of these three elements. *See Carter*, 218 F.3d at 601.

2.     *Analysis*

Here, petitioner is not entitled to relief because he points to no exculpatory evidence which was withheld by the prosecution. It is apparent from the record that the swab taken by the police

was never tested for gunshot residue, and petitioner does not dispute this fact. It is well established, that "*Brady* . . . does not require the government to create exculpatory material that does not exist." *United States v. Sukumolachan*, 610 F.2d 685, 687 (9th Cir. 1980); *see also*, *Richards v. Solem*, 693 F.2d 760, 766 (8th Cir. 1982) ("Although the state has a duty to disclose evidence, it does not have a duty to create evidence."). As the Supreme Court has explained, the government in a criminal prosecution "do[es] not have a constitutional duty to perform any particular test." *Arizona v. Youngblood*, 488 U.S. 51, 59 (1988).

Nor can petitioner claim that he was denied a fair trial by the destruction of the swab without testing. Nothing in the record suggests that petitioner ever requested such a test, or that he be permitted to have his own expert test the swab for gunshot residue. To succeed on a destruction of evidence claim, petitioner must show that the evidence was destroyed in bad faith, *see Youngblood*, 488 U.S. at 57-58; *California v. Trombetta*, 467 U.S. 479, 488 (1984), and that the evidence "possess[ed] an exculpatory value that was *apparent before* the evidence was destroyed[.]" *Trombetta*, 467 U.S. at 489 (emphasis added); *accord Jones v. McCaughtry*, 965 F.2d 473, 477 (7th Cir. 1992). The police officers testified that a gunshot residue test was not performed because the expense was unjustified in light of the fact that petitioner was discovered holding the gun. *See* Trial Tr., Vol. II, at 467-68. Petitioner has offered nothing to rebut this explanation, or any other evidence of bad faith on the part of the police in failing to test and ultimately destroying the swab. Further, has not established that the swab had an apparent exculpatory value; to the contrary, he argues only that further testing would have revealed the exculpatory value. *See Caldwell v. Russell*, 181 F.3d 731, 738-39 (6th Cir. 1999). There is nothing but petitioner's own speculation that further testing would have uncovered exculpatory evidence which would have affected the outcome of his trial.

14

*See United States v. Jobson*, 102 F.3d 214, 219 (6th Cir. 1996). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.   *Confrontation Claim (Claim IV)*

Finally, petitioner contends that he was denied his right to confront the witnesses when Sergeant Jeff Fray was permitted to testify concerning the fingerprint and swab tests, of which he had no personal knowledge. The Court need not decide whether Sergeant Fray's testimony violated the Confrontation Clause, however, because even if there was constitutional error it was harmless.

In *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the Supreme Court ruled that trial error does not entitle state prisoners to habeas relief unless the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Confrontation Clause violations are subject to harmless error analysis. *See Lilly v. Virginia*, 527 U.S. 116, 139-40 (1999). Here, Sergeant Fray's testimony did not provide any inculpatory evidence against petitioner. With respect to fingerprints, Fray testified only that the police were unable to lift any identifiable fingerprints off of the guns. *See* Trial Tr., Vol. II, at 465. With respect to the gunpowder residue test, Sergeant Fray testified that although a swab had been taken, no such test had been performed. *See id.* at 467. In light of the evidence at trial, including the eyewitness testimony of the victims and police officers, and the testimony of petitioner's accomplices, Fray's testimony concerning a negative fingerprint test and the failure of the police to conduct gunpowder residue test could not have had a substantial and injurious effect on the jury's verdict. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.   *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.     NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives<br>
PAUL J. KOMIVES<br>
UNITED STATES MAGISTRATE JUDGE

Dated: 12/8/06

> The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on December 8, 2006.
>
> s/Eddrey Butts
> Case Manager